**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| MICHAEL WESCOTT,<br><br>Plaintiff<br><br>v.<br><br>MAINE DEPARTMENT OF CORRECTIONS; MARTIN MAGNUSSON, Commissioner of Maine Department of Corrections; JOSEPH LEHMAN, Commissioner of Maine Department of Corrections; MARY ANN SAAR, Associate Commissioner for Maine Juvenile Services; LARS OLSEN, Superintendent of Maine Youth Center; ROBERT LANCASTER, Superintendent of Maine Youth Center; A.L. CARLISLE, Associate Commissioner for Maine Juvenile Services and Director of Rehabilitation and Admission Programs; BARBARA HEATH, Psychologist for Maine Youth Center; SCOTT DEWITT, Training School Counselor; DANIEL NEE, Training School Counselor Supervisor; CHRISTOPHER COYNE, Training School Counselor; DANIEL DICKSON, Training School Counselor; JEFFERY HAWKINS, Training School Counselor; KIMBERLY ACKLEY GENDRON, Training School Counselor; BARRY LEMERY, Training School Counselor; BRAIN MACDOUGALL, Training School Counselor; MATTHEW NEE, Training School Counselor; JEFF TARDIFF, Training School Counselor; MICHAEL WHELAN, Training School Counselor; JANE AND/OR JOHN DOE, Training School Counselor(s) | * | CIVIL ACTION No. |

**COMPLAINT (JURY TRIAL REQUESTED)**

**INTRODUCTION**

1. This is a civil rights case challenging the use of excessive isolation, excessive restraint, excessive force, and sexual assault of Michael Wescott, as well as deliberate denial of adequate rehabilitative treatment and denial of his right to receive an appropriate education.

2. Beginning in 1995, when Michael was twelve years old, and continuing until his release in 2001, Michael was intermittently confined at Maine Youth Center ("MYC"). During his confinement, MYC medical providers failed to appropriately treat Michael for his severe Attention Deficit Hyperactivity Disorder ("ADHD") (historically termed or referred to as Attention Deficit Disorder or "ADD") despite being aware of his diagnosis and need for medical treatment.

3. As a result, Michael experienced ADHD that led him to experience symptoms that MYC treated as "acting out". These "misbehaviors" routinely caused Michael to be placed in MYC's Intensive Care Unit ("ICU"), which meant being subjected not only to prolonged confinement in isolation, but often excessive and inhumane restraint, inappropriate strip searches, as well as physical, sexual, and psychological abuse by MYC guards.

4. The mistreatment Michael received while confined at MYC resulted in permanent physical, psychological and emotional damage and has prevented Michael from being able to lead a normal life.

5. Plaintiff Michael Wescott brings this action to recover damages for the violation of his federal and state constitutional and civil rights committed by the officers and employees of the State of Maine Department of Corrections during his confinement.

## JURISDICTION & VENUE

6.      Venue is proper in the District Court of Maine under 28 U.S.C. § 1391(b) because the incidents complained of took place in the City of South Portland, County of Cumberland, State of Maine or City of Augusta, County of Kennebec, State of Maine, commencing in 1995 and continuing until Plaintiff's release from confinement at the age of 18. Under Rule 3(b) of the Rules of this Court, this action is properly filed in Portland because a substantial portion of the events at issue occurred in Cumberland County.

7.      This action is brought pursuant to Federal Civil Rights Law, 42 U.S.C. §§ 1983 and 1988, the Federal Juvenile Justice and Delinquency Prevention, 34 U.S.C. § 11101 et seq., the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq., the Americans with Disabilities Act, 20 U.S.C. § 12101 et seq., and the Eighth and Fourteenth Amendments to the United States Constitution.

8.      Additionally, this action is also brought pursuant to State Law under the Maine Juvenile Code, 15 M.R.S. § 3001 et seq., and the Maine Corrections Code, Subchapter V, Maine Youth Center, 34-A M.R.S. § 3801 et seq.

9.      Title 28 U.S.C. §§ 1331 and 1343 provide federal-question jurisdiction, and 28 U.S.C. § 1367(a) provides supplemental jurisdiction over state law claims.

## PARTIES

10.      The Plaintiff, Michael Wescott is an individual residing in Gorham, Cumberland County, Maine, and at all material times, was a citizen of the United States and was a minor child until 2001. By the age of twelve, Michael had been diagnosed with ADHD, brain disorders characterized by hyperactivity, impulsivity, and inattention.

11.     Defendant Maine Department of Corrections ("DOC") is "responsible for the direction and general administrative supervision, guidance, and planning of adult and juvenile correctional facilities and programs within the State." § 1202. The DOC is the department under which Maine Youth Center, Maine's only state-run center for the incarceration of juveniles, is operated. 34-M.R.S. §§ 1202, 3801, 3802. At all material times and until June 4, 1999, the juvenile correctional facility located in South Portland, Maine was named the Maine Youth Center; after that date, pursuant to 34-A M.R.S. § 3801, the name of the facility was changed to the Southern Maine Juvenile Facility, and later, on July 1, 2001, to the Long Creek Youth Development Center. For purposes of this Complaint, the facility will be referred to as the Maine Youth Center ("MYC").

12.     Defendant Martin Magnusson, during a portion of the time material herein, was the Commissioner of Corrections for the State of Maine located at State Office Building in Augusta, Maine, and he is sued in his official capacity;

13.     Defendant Joseph Lehman, during a portion of the time material herein, was the Commissioner of Corrections for the State of Maine located at State Office Building in Augusta, Maine, and he is sued in his official capacity;

14.     Defendant Mary Ann Saar, during a portion of the time material herein, was an Associate Commissioner for Juvenile Services for the State of Maine located at State Office Building in Augusta, Maine, and she is sued in her official capacity;

15.     Defendant Lars Olsen, during a portion of the time material herein, was the Superintendent of Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his official capacity;

16.     Defendant Robert Lancaster, during a portion of the time material herein, was the Acting Superintendent of Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and during a portion of the time material herein, was the Assistant Superintendent of Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his official capacity;

17.     Defendant A.L. Carlisle, during a portion of the time material herein, was the Associate Commissioner for Juvenile Services for the State of Maine, located at State Office Building in Augusta, Maine, and during a portion of the time material herein, was the Director of Rehabilitation and Admission Programs, and during a portion of the time material herein, was the Assistant Superintendent of Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and she is sued in her individual capacity;

18.     Defendant Barbara Heath, at  material times herein, was a psychologist for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and she is sued in her official and individual capacity;

19.     Defendant Scott Dewitt, during a portion of the time material herein, was a Training School Counselor Supervisor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

20.     Defendant Daniel Nee, during a portion of the time material herein, was a Training School Counselor Supervisor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

21.     Defendant Christopher Coyne, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

22.     Defendant Daniel Dickson, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

23.     Defendant Jeffrey Hawkins, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

24.     Defendant Kimberly Ackley Gendron, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and she is sued in her individual capacity;

25.     Defendant Barry Lemery, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

26.     Defendant Brian MacDougall, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

27.     Defendant Matthew Nee, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

28.     Defendant Jeff Tardiff, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

29.     Defendant Michael Whelan, during a portion of the time material herein, was a Training School Counselor for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, and he is sued in his individual capacity;

30.     Defendants Jane Doe and/or John Doe encompass all unidentified individuals who worked as Training School Counselors for Maine Youth Center, located at 675 Westbrook Street in South Portland, Maine, throughout all relevant times hereto.

31.     At all times material hereto, based upon their official statuses as employees of the State of Maine Department of Corrections or statuses as being under contract with the State of Maine Department of Corrections, the Defendants were operating under the color of state law;

32.     As a result of their official capacity at all material times the above-named Defendants had a duty to the Plaintiff, Michael Wescott.

## STATEMENT OF THE FACTS

*I.     Maine Youth Center Policy and Practices*

33.     During all material times, it was the policy, custom, and practice of MYC to use isolation as a means of "treatment" for certain children. This meant removing certain children from the regular program, eliminating all contact with other children, and secluding them in a locked cell for impermissibly extended and excessive periods of time.

34.     The practice of isolation is statutorily termed as "placing a child under observation" 34-A M.R.S. § 3809(2).

35.     Isolation is deemed permissible when a child's "behavior presents a high likelihood of imminent harm to that juvenile or others, presents a substantial and imminent threat of destruction of property" or "demonstrates a proclivity to be absent from the facility without leave." 34-A M.R.S. § 3809(1). Isolation is to be limited only to circumstances where the child demonstrates that "anything less restrictive would be ineffectual for the control of the juvenile's behavior." § 3809(1).

36.     The conditions under which the child "is placed under observation must conform with all applicable federal and state standards relating to the health and safety of clients in correctional facilities." § 3809(2)(B).

37.     A child may not be placed in isolation for more than "the period of time necessary to alleviate and prevent the reoccurrence of the behavior." § 3809(2)(C).

38.     Isolation must not be used as a form of punishment. *See* § 3809(2)(C).

39.     MYC used the Intensive Care Unit ("ICU") for housing those placed in isolation. When placed in isolation, children were locked in filthy eight-by-ten-foot cells that contained a metal bench bed or green plastic cot, a combination metal sink/toilet, concrete floor, and a light panel in the wall.

40.     Moreover, the lighting in the cells was dim; it was too dim to read yet bright enough to inhibit one's ability to fall and/or stay asleep.

41.     While in isolation, children received no educational or mental health services, nor could they participate in any other programming.

42.     Even though isolation periods frequently extended beyond 24 hours, routinely exceeding 72 continuous hours, children in isolation were only provided a maximum of one hour of exercise per day.

43. MYC also used a "restraint chair" to restrain and punish children. This was all part of a "lock 'em up and beat 'em down" approach to child incarceration during the relevant period.

44. MYC also utilized zip ties to restrain and punish children who were acting out. MYC Officers would leave children with their wrists and ankles tied tightly together for hours on end until they decided to release them.

*II. Michael Westcott's Background*

45. Michael grew up in Westbrook, Maine, and was diagnosed with ADHD as well as a learning disability at an early age, and therefore received special education beginning in the first grade.

46. Michael's management of his ADHD was a persisting issue that caused him to outwardly misbehave and was often at the root of how and/or why he got himself into trouble. Starting in junior high school, Michael's impulsiveness became more pronounced as his disability greatly impacted his ability to delay or inhibit his immediate responses. To his dismay, he grew more familiar with the juvenile criminal justice system and ultimately found himself detained at the MYC.

47. Throughout his first stint at MYC, whenever twelve-year-old Michael acted out or misbehaved, it was MYC's policy to provide him "treatment," which meant being forced to sit at a table facing the wall, alone for hours, without speaking to anyone in the cottage where he lived on the MYC campus.

48. To use the restroom while in "treatment," MYC policy required children to raise their hands to receive permission. Michael would raise his hand to ask for permission, but no one would ever call on him. This resulted in Michael urinating and defecating himself on more than one occasion. Guards would then publish this information to other children and make fun of him

for having an accident. Therefore, electing to act in the alternative, Michael would go to the restroom even without permission if no one would call on him. This resulted in Michael being punished further and having to write essays about why he went to the restroom without permission.

49.     Michael's first stint at MYC lasted about one month.

50.     Following his release, Michael was sent to the Weymouth House, a residential treatment program in Bristol, Maine, and attended Lincoln Academy. During this time, Michael continued to struggle to control his ADHD symptoms; he often acted out and got into trouble specifically for distributing his medication to others and fighting with others. In the end, Michael was expelled and subsequently ousted from Weymouth House. This caused him to violate probation and be sent back to MYC.

51.     At this point, the treatment he received at MYC elevated too not only being psychologically abusive but also physically and sexually abusive as well. This abusive conduct occurred both in the "cottage" (general population) and the ICU (segregation).

52.     Michael was treated for his ADHD with Ritalin, a common and accepted medication given to ADHD patients, from before the age of twelve and at all times pertinent hereto, except while at the MYC. MYC refused to properly medicate Michael and instead treated him with Benadryl, an inappropriate and contraindicated over the counter medication. In part because of the lack of proper medication, Michael was unable to sit still, remain silent, or comply with demands to do so, or engage in other restrictive requirements ordered by staff.

53.     In the cottage, Michael was frequently in trouble for failing to remain quiet. On one occasion when he failed to comply with an order to remain silent, a staff member came over to the table where Michael was eating and spit in his food, demanding that Michael then eat the food.

When Michael refused, the staff member grabbed him by the hair and slammed his face into the plate of food.

54.     The time Michael spent in the ICU caused him to deteriorate quickly, each time leaving him in worse condition than before. The endless solitude caused Michael to harm himself, including cutting and biting himself. Each time Michael harmed himself, the response from MYC staff was to strip Michael of his clothing and place him in a restraint chair where he would be observed for hours on end.

55.     During restraint, Michael was often tortured by the guards, being slapped, ridiculed, and subjected to verbal abuse.

56.      Michael was repeatedly strip-searched at MYC. It occurred in the cottages after visits as well as in the ICU. The strip searches – where the guards would instruct the juvenile male residents to "squat and cough" – were often done in front of female guards. Specifically, while Michael was in the ICU, he was told by a group of guards to strip down, even though a female guard was present. Michael, embarrassed, refused. Due to his refusal, he was tackled by the guards, who pulled down his drawers and conducted the search in an extremely invasive manner, which included Michael's testicles and buttocks being inappropriately touched and, on at least one occasion, fondled by the male guards conducting them.

57.     On one occasion, Michael was patted down by a female guard. The female guard rubbed her hands down his arms, chest, stomach, and genitals. Viewing the guard as an authority figure and thus believing he did not have a choice, Michael stayed neutral and did not respond. Seeing that he was not responding, the female guard proceeded to fondle Michael's genitals and then rubbed his penis until he ejaculated. The female guard engaged in this sexual conduct for her own sexual gratification.

58. Furthermore, if observed masturbating in his ICU cell, male and female guards would bang on the cell door and embarrass and ridicule Michael, as punishment for his behavior. He was referred to as "wetcock" by the guards and was required to keep his hands over his blanket if caught masturbating.

59. Guards constantly called Michael demeaning and dehumanizing names and repeatedly slapped his head.

60. On at least one occasion, a male guard incessantly antagonized Michael while Michael was locked inside of his cell. The guard placed his face in the small window of the door and called Michael demeaning and dehumanizing names. Michael grew so upset that he punched the window of the door where the guard's face had been.

61. Michael was physically beaten and injured by the guards by being thrown to the ground and hogtied.

62. Michael was forced to write "essays" on how "not to talk" to deal with his ADHD.

63. Guards would put salt in Michael's food so that it was inedible.

64. Several times Michael was so desperate in ICU that he tried to end his life by cutting his wrists. Usually, his self-inflicted wrist injuries would be treated at the MYC and he would be put back in his cell naked with the door left open without a blanket. A guard was then posted outside the door and would repeatedly demean and excoriate him.

65. On one occasion Michael cut his wrist, reached inside the cut, and "pulled something." He was transported to the hospital for treatment.

66. He attempted suicide by hanging using a sheet.

67. At this point in time, Michael was willing to do anything to get out of the ICU and away from the abuse he was receiving at MYC.

68. While at MYC, Michael was denied treatment for his ADHD and denied adequate mental health treatment. His previously disabling mental health condition was exacerbated, and he also developed PTSD because of the intolerable conditions and treatment. He received no mental health treatment following his suicide attempts despite the obvious need for treatment.

69. Michael was also put in a less restrictive unit called the New Security Building ("NSB") for a period of his time at MYC. There he was in lockdown 20 hours a day, getting out for breakfast, lunch, and dinner, and he could walk around. He was housed in a small room with a cot, metal toilet, brick walls, and a tiny opaque window.

70. Throughout the time Michael spent in isolation and segregation it was known in the correctional community that (1) mentally disabled inmates were more likely to be isolated, and (2) that the impact of isolation on mentally disabled inmates was more severe, leading to exacerbation and creation of additional mental health illnesses, and including increased threat of attempted and actual suicide. Placing Michael in the ICU and NSB was done with deliberate indifference to a substantial risk of serious harm, known at all pertinent times by MYC personnel who also failed to administer proper mental health and medical treatment to Michael thereby greatly increasing the known risk of harm.

71. While confined at MYC, due to being often placed in isolation or segregated from his peers, Michael was denied his right to an appropriate education.

72. To summarize, during his confinement at MYC, Michael was frequently and forcibly strip-searched, which involved Michael being stripped of his clothing and physically, psychologically, and sexually assaulted. Defendants forcibly touched and fondled Michael's buttock and genitals to cause him physical and/or psychological pain while restraining him. Female

guards were present both during strip searches and while the children took showers, observing Michael's, and others, naked teenage bodies.

73. Defendants unconsented physical touching of Michael's genitals and buttocks while conducting strip searches, throughout which he was restrained, was done with intent to cause Michael's physical discomfort, suffering and pain, as well as to offend, degrade, and humiliate him, and for the sexual gratification of the perpetrator.

74. Defendants continued cruel treatment of Michael throughout his confinement at MYC caused him to develop, and continued to exacerbate, severe emotional and mental disabilities, including but not limited to PTSD, depression, overwhelming anxiety, and ADHD.

75. While incarcerated at MYC and for years thereafter, Michael failed to recognize that the inappropriate and cruel treatment he received at MYC was committed in violation of his constitutional rights. He believed the treatment he received while incarcerated as a juvenile at MYC was typical and inescapable; he did not recognize or understand it as being wrong.

76. Michael was released and reincarcerated at least one time between the ages of eighteen to twenty-one. He was officially released from MYC and freed from the juvenile system in 2001. Since then, due to the mistreatment, Michael has suffered constant anxiety, hypervigilance, and is unable to lead a normal life. He suffers from and has been diagnosed with, PTSD, ADHD, major depression, and personality disorder. He finds it difficult to be alone or stay in any one place for a prolonged amount of time. He has a service dog prescribed by his doctor.

77. Before, during, and after his release in 2001, Michael has suffered and continues to suffer from multiple severe emotional and mental disabilities.

78. Due to his disabilities, Michael's ability to function in society is severely limited and has prevented him at all pertinent times from protecting his rights.

79. Since leaving the MYC, Michael has been unable to successfully hold a job or care for himself. He is unemployable.

80. For eight years, Michael was homeless. During this time, he lived in thirty-four states; he was running from state to state, afraid of being locked down in one place.

81. Although currently sober, Michael struggles with drug and alcohol addiction.

82. Since 2007, Michael has worked regularly with a caseworker to enable him to meet his day-to-day obligations.

83. As a result of working with a caseworker, Michael was able to apply for social security disability benefits due to mental illness in 2008. Michael was on the waiting list to receive Supplemental Security Income ("SSI") from 2008-2010. During that interim, Michael received Maine General Assistance, entered the Avesta Housing program, and received food vouchers. As a result of the help that his caseworker provided, Michael was able to put a roof over his head and feed himself for the first time. Michael was determined fully disabled and eligible due to mental illness in 2011.

84. Michael was unable to manage his own SSI benefits. A family member became the social security benefit payee and controls his limited finances.

## COUNT I

**42 U.S.C. § 1983 — Eighth Amendment: Excessive Isolation, Excessive Restraints, Excessive Force**

**(Plaintiff Michael Wescott v. Defendants Dewitt, D. Nee, Coyne, Dickson, Hawkins, Gendron, Lemery, MacDougall, M. Nee, Tardiff, Whelan, Jane Doe and/or John Doe)**

85. All previous paragraphs are incorporated herein by reference as though fully set forth.

86. Plaintiff makes a claim under 42 U.S.C. § 1983 for violation of the Eighth Amendment of the United States Constitution.

87.    The Eighth Amendment prohibits "the unnecessary and wanton infliction of pain."

*Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

88.    Whether measures taken by prison guards constitute "unnecessary and wanton infliction of pain and suffering ultimately turns on whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* at 6 (citing *Whitely v. Albers*, 475 U.S. 312, 320-21 (1986)).

89.    To decide what force is excessive, and thus crosses the constitutional line, courts look to such factors as:

      a.  The need for force;
      b.  Whether the amount of force used was reasonable given the need;
      c.  How serious the need for force appeared to the guard(s);
      d.  Whether the guard(s) made efforts to use as little force as necessary; and
      e.  How badly the complainant was injured.

*Johnson v. Glick*, 481 F. 2d 1028, 1033 (2d Cir. 1973).

90.    Training School Counselors Dewitt, D. Nee, Coyne, Dickson, Hawkins, Gendron, Lemery, MacDougall, M. Nee, Tardiff, Whelan, and/or Jane Doe and/or John Doe, while acting under color of state law, deliberately, purposefully, and knowingly used excessive isolation, excessive restraint, and excessive force against Michael that was objectively unreasonable in violation of the Eighth Amendment of the United States Constitution.

91.    Training School Counselors Dewitt, D. Nee, Coyne, Dickson, Hawkins, Gendron, Lemery, MacDougall, M. Nee, Tardiff, Whelan, and/or Jane Doe and/or John Doe, maliciously and sadistically utilized excessive isolation and restraint tactics, as well as utilized excessive force to cause harm to Michael.

92. The use of force deprived Michael of his clearly established right to be protected from unnecessary and wanton infliction of pain and suffering, as guaranteed by the Eighth Amendment to the United States Constitution.

WHEREFORE, Plaintiff Michael Wescott respectfully requests that the Court enter judgment against the Defendants on Count I and award him actual and punitive damages in an amount to be proven at trial, costs, interest, attorneys' fees, and any other relief the Court deems just and equitable.

**COUNT II**
**42 U.S.C. § 1983 — Eighth Amendment: Sexual Assault**
**(Plaintiff Michael Wescott v. Defendants Dewitt, D. Nee, Coyne, Dickson, Hawkins, Gendron, Lemery, MacDougall, M. Nee, Tardiff, Whelan, Jane Doe and/or John Doe)**

93. All previous paragraphs are incorporated herein by reference as though fully set forth.

94. Plaintiff makes a claim under 42 U.S.C. § 1983 for violation of the Eighth Amendment of the United States Constitution.

95. In *Farmer v. Brennan*, the U.S. Supreme Court recognized the right to be free from rape and sexual assault in prison, holding that deliberate indifference to the substantial risk of sexual assault violates prisoners' rights under the Cruel and Unusual Punishment Clause of the Eighth Amendment. 511 U.S. 825, 829 (1994).

96. Rape or sexual assault committed by prison guards, facility supervisors, and/or any other similarly situated people violate the U.S. Constitution. *Smith v. Cochran*, 339 F.3d 1205, 1213 (10th Cir. 2003).

97. Because sexual assault is both malicious and harmful, it is deemed unjustifiable conduct without any "legitimate penological purpose." *Farmer*, 511 U.S. at 834. This means that

meeting the constitutional test for an Eighth Amendment violation due to rape or sexual assault in prison is less difficult than other assault cases. *See id.*

98.    Claims for sexual assault may be brought even if no physical injury resulted. *Schwenk v. Hartford*, 204 F.3d 1187, 1196-97 (9th Cir. 2000).

99.    Moreover, the Prison Rape Elimination Act ("PREA") was passed by Congress in 2003 and applies to all detention facilities, including federal and state prisons, jails, private facilities, and immigration detention centers, specifically recognizing that sexual assault in detention can constitute a violation of the Eighth Amendment. 42 U.S.C. § 15601(13).

100.    A prison official violates the Eighth Amendment when:

a. He/she acts or fails to act, which results in creating an objectively serious harm or risk of harm to the inmate; and
b. His/her subjective state of mind is one of "deliberate indifference" — meaning that the official knew of the substantial risk to the inmate's health or safety and did nothing to adequately protect or prevent the injury-causing event.

*Farmer*, 511 U.S. at 834.

101.    Training School Counselors Dewitt, D. Nee, Coyne, Dickson, Hawkins, Gendron, Lemery, MacDougall, M. Nee, Tardiff, Whelan, and/or Jane Doe and/or John Doe, while acting under color of state law, deliberately, purposefully, and knowingly mistreated Michael, and created an environment that allowed for objectively serious harm to be caused to Michael.

102.    Michael was routinely, repeatedly, and often unnecessarily, stripped searched by male officials at MYC, and on one occasion by a female official.

103.    At all times material hereto, Training School Counselors Dewitt, D. Nee, Coyne, Dickson, Hawkins, Gendron, Lemery, MacDougall, M. Nee, Tardiff, Whelan, and/or Jane Doe and/or John Doe, while acting under color of state law, acted with deliberate indifference to

Michael's safety or wellbeing, resulting in Michael suffering from constant anxiety, PTSD, depression, and personality disorder.

WHEREFORE, Plaintiff Michael Wescott respectfully requests that the Court enter judgment against the Defendants on Count II and award him actual and punitive damages in an amount to be proven at trial, costs, interest, attorneys' fees, and any other relief the Court deems just and equitable.

**COUNT III**
**42 U.S.C. § 1983 — Eighth Amendment: Denial of a Right to Treatment**
**(Plaintiff Michael Wescott v. Defendant Heath, Jane Doe and/or John Doe)**

104. All previous paragraphs are incorporated herein by reference as though fully set forth.

105. Plaintiff makes a claim under 42 U.S.C. § 1983 for violation of the Eighth Amendment of the United States Constitution.

106. Defendant Barbara Heath and other MYC health professionals, including Jane Doe and/or John Doe, acted in deliberate indifference by failing to address or treat Michael's serious medical needs, including his ADHD and severe mental health issues, which resulted in causing ongoing, unnecessary, and wanton infliction of pain.

107. Barbara Heath and other MYC health professionals refused to properly treat and/or medicate Michael during his time at MYC.

108. Initially, Michael was prescribed Wellbutrin. Michael repeatedly expressed experiencing negative, medically acknowledged, side effects from the medication in that it made him feel angry. Eventually, Michael was taken off the Wellbutrin.

109. Then, although Ritalin was a common and accepted medication given to patients with ADHD at that time, Heath and other health professionals refused to medicate Michael with

it. She instead gave him Benadryl, which was an ineffective and inappropriate treatment, and contraindicated for ADHD patients in that it acted to increased symptoms associated with ADHD.

110. Michael has no memory of ever getting the opportunity to meet with Barbara Heath to discuss his medical needs.

111. Due to Heath's failure to appropriately treat Michael for ADHD, Michael was frequently in trouble due to his inhibited ability to remain quiet or control his immediate responses.

112. As a result of his lack of appropriate medication for his ADHD, Michael was often sent to isolation for extended periods. Consequently, he began to engage in self-harm. He was never provided appropriate medical health treatment for such conduct.

113. Michael tried to end his life several times while in isolation. He cut his wrists and attempted to hang himself by using a sheet. He received no mental health treatment despite his suicide attempts.

114. The Defendants' deliberate indifference to Michael's health and wellbeing violated Michael's clearly established right to be protected from unnecessary and wanton infliction of pain and suffering, guaranteed by the Eighth Amendment.

WHEREFORE, Plaintiff Michael Wescott respectfully requests that the Court enter judgment against the Defendant on Count III and award him actual and punitive damages in an amount to be proven at trial, costs, interest, attorneys' fees, and any other relief the Court deems just and equitable.

## COUNT IV
### 42 U.S.C. § 1983 — *Monell* Claim for Negligent Hiring and Failure to Train (Plaintiff Michael Wescott v. Defendants DOC, MYC, Magnusson, Lehman, Saar, Olsen, Lancaster, Carlisle)

115. All previous paragraphs are incorporated herein by reference as though fully set forth.

116. A governmental entity may be held liable under § 1983 only for its own unconstitutional or illegal policies and not for the tortious acts of its employees. *See Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978).

117. Such liability also exists where a governmental entity fails to properly train, supervise, and discipline its employees amounting to deliberate indifference to one's constitutional rights. *Ohio v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983).

118. To establish a § 1983 claim against a governmental entity such as a state correctional facility, the plaintiff must allege that "(1) the policy or custom existed; (2) the governmental policymakers actually or constructively knew of its existence; (3) a constitutional violation occurred [by a person acting under the color of state law]; and (4) the custom or policy served as the moving force behind the violation." *Meadowbriar Home for Children v. G.B. Gunn*, 81 F.3d 521, 532-33 (5th Cir. 1996).

119. An offending policy may be an official policy adopted or promoted by the governmental entity or a "persistent, widespread practice of the [governmental entity] officials or employees" that is "so common and well settled as to constitute a custom that fairly represents [governmental entity] policy." *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

120. A policy or custom becomes "official for purpose of § 1983 when it results from the decision or acquiescence of the municipal officer or body with final policymaking authority over the subject matter of the offending policy." *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 615 (5th Cir. 1999) (citing *Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 737 (1989)).

121. However, "[t]he description of policy or custom and its relationship to the underlying constitutional violation . . . cannot be conclusory; it must contain specific facts." *Spiller v. City of Texas City, Police Dept.*, 130 F.3d 162, 167 (5th Cir. 1997).

122.    Finally, a plaintiff must also assert that the inadequate policy or custom was adopted with deliberate indifference to the constitutional rights of its citizens. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387-91.

123.    At all times relevant, Defendants Magnusson, Lehman, Saar, Olsen, Lancaster, and Carlisle, each in their supervisor capacity at MYC, a state-run center for the incarceration of juveniles operating under the Maine DOC, had a duty to properly train, supervise, and discipline their employees and agents in the use of isolation, restraint, and force, specifically on the use of such tactics in relation to incarcerated juveniles, pursuant to 34-A M.R.S. § 1202.

124.    Defendants breached that duty in part by:

a. Improperly training, authorizing, encouraging, or directing officers on the proper use of isolation, restraint, and force in relation and the effects of such tactics when used on juvenile residents.
b. Failing to adequately investigate allegations of excessive isolation, restraint, and force.
c. Failing to meaningfully discipline officers for violations of policy related to excessive force.

125.    The policy, pattern of practice, or custom of condoned misconduct is tacitly or overtly sanctioned, as evinced by Defendants' failure to train, supervise, investigate, and meaningfully discipline Training School Counselors for their use of excessive isolation, restraint, and force on juvenile residents at MYC.

126.    The unconstitutional behavior of MYC's Training School Counselors was carried out pursuant to the policy, the pattern of practice, and/or the custom, whether formal or informal, which violates the constitutional rights of persons situated such as the Plaintiff.

127.    It was the policy, pattern of practice, and/or custom that MYC Training School Counselors not to report the use of such isolation, restraint, or force as required.

128.    The Training School Counselors' custom of subjecting juvenile residents to impermissibly prolonged confinement in isolation, excessive and frequent use of restraint, inappropriate and sexualized strip searches, as well as continued and routine physical abuse, establishes an overt policy, pattern of practice, and/or custom of condoned misconduct and is causally related to the violations of Michael's constitutional and civil rights.

129.    The DOC, MYC, and its supervisors — Defendants Magnusson, Lehman, Saar, Olsen, Lancaster, and Carlisle — had knowledge of the Training School Counselors' excessive and unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

130.    Defendants made a deliberate and/or conscious decision to disregard the known risk of harm that would result from the Counselors' unconstitutional patterns and practices and acted deliberately indifferent to and/or tacitly authorized the same.

131.    On or before 1995 until at least 2001, MYC supervisors acted with deliberate indifference to the rights of their juvenile residents, and tolerated, permitted, failed to correct, promoted, and/or ratified a number of unconstitutional customs, patterns, or practices that failed to provide for the safety of incarcerated juvenile residents, including, but not limited, excessive use of isolation, restraint, and force.

132.    Throughout the aforementioned timeframe, MYC supervisors, with deliberate indifference to the rights of incarcerated juvenile residents, tolerated, permitted, failed to correct, promoted or ratified a number of customs, patterns, and/or practices that shall be further identified in discovery.

133.    As a direct proximate cause of the actions of the Defendants, Plaintiff has suffered damages.

WHEREFORE, Plaintiff Michael Wescott respectfully requests that the Court enter judgment against the Defendants on Count IV and award him actual and punitive damages in an amount to be proven at trial, costs, interest, attorneys' fees, and any other relief the Court deems just and equitable.

**COUNT V**
**42 U.S.C. § 1983 — Fourteenth Amendment: Right to Educational Services**
**(Plaintiff Michael Wescott v. Defendants DOC, MYC, Magnusson, Lehman, Saar, Olsen, Lancaster, Carlisle, Dewitt, D. Nee, Coyne, Dickson, Hawkins, Gendron, Lemery, MacDougall, M. Nee, Tardiff, Whelan, Jane Doe and/or John Doe)**

134. All previous paragraphs are incorporated herein by reference as though fully set forth.

135. The Equal Protection Clause of the Fourteenth Amendment requires that no child be denied access to school and that all children be given equal educational opportunities, regardless of their race, ethnicity, background, religion, sex, or citizenship. *See Brown v. Board of Education*, 347 U.S. 483, 495 (1954).

136. Moreover, the Individuals with Disabilities Education Act ("IDEA") requires that students with disabilities be provided with an education that is appropriate for them. 20 U.S.C. § 1400.

137. The State is required to have policies and procedures in effect to ensure that public agencies in the State meet the Least Restrictive Environment requirements, essentially requiring that children with disabilities are educated with children who are nondisabled to the maximum extent possible. *See* 34 CFR § 300.114(a)(1)(2).

138. While in confinement at MYC, Michael was denied his right to an appropriate education.

139.    Michael was only able to attend school with the other children at the very beginning of his confinement at MYC.

140.    While housed in the NSB building, the education provided to the children consisted of being placed in a classroom with a Television and VCR set. Educational videos, such as science videos, would be played for the children. Then, children were assigned to either write essays on what they had learned or take quizzes and/or tests.

141.    Each time Michael was placed in isolation, he was removed from the regular programming, including educational programming, and was prevented from interacting with his peers.

142.    Defendants denied Michael access to education and failed to provide him an appropriate education in recognition of his mental disabilities.

WHEREFORE, Plaintiff Michael Wescott respectfully requests that the Court enter judgment against Defendant Olsen on Count V and award him actual and punitive damages in an amount to be proven at trial, costs, interest, attorneys' fees, and any other relief the Court deems just and equitable.

**COUNT VI**
**42 U.S.C. § 12132 — Discrimination Against Qualified Individual with Disabilities in Violation of the Americans with Disabilities Act and the Rehabilitation Act**
**(Plaintiff Michael Wescott v. Defendants DOC, MYC, Magnusson, Lehman, Saar, Olsen, Lancaster, Carlisle, Heath)**

143.    All previous paragraphs are incorporated herein by reference as though fully set forth.

144.    "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

145.    The term "disability" means, "a physical or mental impairment that substantially limits one or more life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C).

146.    Congress intended the definition of "disability" to be "construed in broad coverage of individuals . . . to the maximum extent permitted." § 12102(4)(A).

147.    Michael Wescott is an individual with a disability.

148.    Defendants DOC, MYC, Magnusson, Lehman, Saar, Olsen, Lancaster, Carlisle, and Heath, in their official capacities, intentionally refused to provide reasonable accommodations for Michael, despite his diagnosed disabilities and thereby discriminated against Michael because of his disability in violation of 29 U.S.C. § 794.

WHEREFORE, Plaintiff Michael Wescott respectfully requests that the Court enter judgment against Defendants on Count VI and award him actual and punitive damages in an amount to be proven at trial, costs, interest, attorneys' fees, and any other relief the Court deems just and equitable.

## JURY TRIAL DEMAND

149.    Plaintiff demands trial by jury on each count so triable.

## CONCLUSION

WHEREFORE, Plaintiff Michael Wescott respectfully requests that the Court enter judgment against Defendants on Counts I through VI and award him compensatory damages in the amount of one million dollars, as well as any other actual and punitive damages in an amount to be proven at trial, costs, interest, attorneys' fees, and any other relief the Court deems just and equitable.

Dated March 11, 2021 in Portland, Maine.

Respectfully submitted,

*/s/ Thomas F. Hallett*

______________________________

Thomas F. Hallett, Bar No. 3142
Jordan T. Ramharter, Bar No. 6556
*Attorneys for Plaintiff*
HALLETT WHIPPLE WEYRENS
6 City Center, Suite 208
P.O. Box 7508
Portland, ME 04112-7508
PH: 207-775-4255
*thallett@hww.law*
*jramharter@hww.law*